
RECEIVED
IN MONROE, LA

APR 1 6 2009

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Cr. A. No. 06-30020-01 |
| VERSUS | JUDGE ROBERT G. JAMES |
| CYNTHIA ANN SINGLETON SIMON | MAG. JUDGE KAREN L. HAYES |

### RULING ON OBJECTIONS TO PRE-SENTENCE REPORT

Pending before the Court are Defendant Cynthia Ann Singleton Simon's ("Simon") objection to the Pre-Sentence Report ("PSR") and two additional motions. Simon originally objected on March 28, 2008, to the loss amount contained in the PSR on the bases that neither a method for computing the alleged losses nor the underlying data were provided. In March 2009, Simon also filed a Motion for Probated Sentence [Doc. No. 59] and a Motion for Downward Departure [Doc. No. 60].

Since Simon's original objection to the PSR, a year has passed, during which the Court continued Simon's sentencing hearing a number of times and held status conferences with counsel to ensure that Simon was provided all information necessary to review and challenge the Government's loss calculation.

A sentencing hearing began in this matter on March 23, 2009, during which time the Government presented the testimony of Federal Bureau of Investigation ("FBI") Agent Jared Medaris ("Medaris"), and Michele Thaxton ("Thaxton"), a C.P.A. employed by Progressive Bank ("the Bank"). Both witnesses testified and were subject to cross-examination. At the end of the day, it was determined that the sentencing hearing should be continued to allow Simon's

counsel additional time to obtain documents from Thaxton for review by their expert, Tim Valdez ("Valdez").

The sentencing hearing resumed on April 14, 2009. On that date, the Court heard additional testimony from Thaxton, as well as the testimony of Valdez.

The Court will first consider Simon's objection on the amount of loss and then will consider her Motions for Probated Sentence and Downward Departure.

### A. Calculation of Loss

United States Sentencing Guidelines § 2B1.1 provides the guideline ranges for loss in a fraud case. "The commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes. Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under these guidelines." U.S.S.G. § 2B1.1, Background.

Application note 3(A)(i) instructs the Court that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, Note 3(A)(i).

Pursuant to U.S.S.G. § 2B1.1(a), Simon's base offense level is 6, but the base offense level is enhanced under § 2B1.1(b)(1) if the amount of loss is greater than $5,000. In this case, the Government contends that the loss to the victims was more than $1,000,000.00, but less than $2,500,000.00, resulting in a 16 level enhancement.

The initial burden is on the Government to prove the loss amount by a preponderance of the evidence. *See United States v. Ollison*, 555 F.3d 152, 164 (5th Cir. 2009) (citation omitted).

2

"Generally, a PSR bears sufficient indicia of reliability to permit the sentencing court to rely on it at sentencing. The defendant bears the burden of demonstrating that the PSR is inaccurate; in the absence of rebuttal evidence, the sentencing court may properly rely on the PSR and adopt it." *United States v. Ayala*, 47 F.3d 688, 690 (5th Cir. 1995) (internal citation omitted). According to the PSR, the probation officer calculated the loss amount through a review of the indictment, the report provided by the FBI, and the report of the Department of Labor.

The PSR set the total actual loss amount at $1,925,393.90. Simon does not challenge the findings of the probation officer as to the amounts she misappropriated in pension funds ($41,254.66) and health care premiums ($19,848.24). She challenges only the loss amount of the Bank, determined by the FBI to be $1,864,291.00.

The Government does not rely on unsubstantiated statements in the PSR, but presented testimony from two witnesses to verify the accuracy of the information provided. Agent Medaris testified that Abby Lines was a trucking company owned and operated by Cindy and Eddie Simon. Eddie Simon handled the dispatching and trucking end of the business while Cindy Simon and a clerical employee handled the business operations.

Agent Medaris also testified that Simon's company, Abby Lines, had a factoring agreement with the Bank. The factoring agreement was entered into by the parties in 1997.

In 1999, Cindy Simon stopped paying quarterly payroll taxes, ultimately resulting in a tax deficiency of $3,028,966.65. *See* Government's Exhibit 1 (Notice of Federal Tax Lien filed in Ouachita Parish on 6/26/02). Consistent with the information provided in the PSR, Agent Medaris testified that Simon admittedly failed to notify the Bank of the tax deficiency and that a tax lien had been filed against Abby Lines. Simon also failed to disclose the tax deficiency,

payment plan, and, ultimately, tax lien, to her accountant Lisa Gill ("Gill"). The tax lien was not listed on 1999 and 2001 financial compilations prepared by Gill. *See* Government's Exhibit 2 (1999 Coporate Return for Abby Lines).

Thaxton, recognized by the Court as an expert in the field of public accounting, testified about Simon's actions with regard to the Bank. She testified that Abby Lines had a factoring account which was maintained in the Bank's business manager system. Under the factoring agreement, the Bank purchased Abby Lines's account receivables at a discount of 2.15% on a full recourse and notification basis. Abby Lines's customers or account debtors were to make their payments directly to a P.O. Box, a lock box, maintained by the Bank. The account debtors were notified that Abby Lines and the Bank had entered into a factoring agreement and that payments were to be made to the Bank. Former Bank President, Joe Doughty ("Doughty"), was the officer overseeing this account, with the assistance of Tina Fortenberry ("Fortenberry"). Both Doughty and Fortenberry were located in Winnsboro, Louisiana.

Thaxton explained how the factoring agreement worked in practice. Abby Lines trucks delivered goods across the country. Abby Lines would invoice the customer/account debtor once the goods were delivered. Hard copies of the invoices were then provided to the Bank, and the Bank would put the amounts of the invoices into Abby Lines's operating account.

Based on the invoices, the Bank would deposit 87.85% of the invoiced amounts into Abby Lines's operating account and 10% into a reserve/savings account. The Bank kept 2.15 % as its fee. The 10% was deposited in a reserve account in the event that the full amount of the

invoice was not paid or the invoice was not paid within ninety (90) days.[1]

In 2001, on Doughty's recommendation, the Bank renewed the factoring agreement with Abby Lines and increased its credit limit.

However, in 2002, Abby Lines was operating in overdraft and was in a rush to get funds advanced. Instead of providing hard copies of the invoices, Simon began faxing an invoice register to Fortenberry. Doughty would approve the advancement of funds to the Abby Lines operating account on the basis of the register, even though the Bank had not received copies of the invoices.

On November 5, 2002, the Bank C.E.O. George Cummings asked Thaxton, who was then an internal auditor, to go to Winnsboro and look into the Abby Lines accounts. Thaxton, Bank employee Kathy Bell, and two assistants worked on the account throughout November and December. Thaxton's time alone was in excess of 300 hours. During this process, they found that in May 2002 Abby Lines began making significant payments to the IRS. They checked into the records and found the tax lien. Thaxton testified that she did not believe that Abby Lines's factoring account would have been renewed in 2001 and its credit line certainly would not have increased if the Bank knew Abby Lines had a tax lien in excess of $ 3 million.

Thaxton prepared and presented a March 13, 2003 report on her findings to the Bank Audit Committee. In that report, Thaxton gave a detailed analysis of Doughty's and Fortenberry's unauthorized and unsound banking practices. Doughty authorized advances

---

[1] If an invoice was not paid within ninety (90) days, then the invoice was reassigned to Abby Lines, the reserve account was reduced by the amount that had been deposited into the Abby Lines's operating account, and there was a subsequent reduction in the outstanding balance of receivables purchased. *See* Government's Exhibit 4 (Thaxton's March 14, 2003 Report to Audit Committee).

greater than those allowed by the factoring agreement, had a Bank employee change the control settings in the computer system to allow an advance in excess of the credit limit, and exceeded his personal lending authority in approving these advances and the payment of Abby Lines's overdrafts. On one occasion, Doughty lied that he had told the Director's Committee about the Abby Lines advances when he had not.

Between June and October 2002, while Abby Lines was operating in overdraft, emails were exchanged between Simon's clerical assistant, Michele Wilson, and Fortenberry indicating the amount that Abby Lines needed to be deposited in the operating account. Approximately two weeks later, Simon would fax an invoice register to support the advances already made. However, Thaxton's investigation revealed that the deliveries were not made prior to the advance of funds. In other words, Simon was delivering current invoices to support previous advances of funds. *See* Government's Exhibits 4 and 5.

On some occasions, funds were advanced to Abby Lines based on supposed invoices provided by Simon, but Thaxton found that the invoices were "non-existent." On other occasions, Simon presented duplicate invoices (i.e. invoices already paid by the customer) to support the advances. Based on one stack of duplicate invoices, Abby Lines was advanced approximately $500,000.00, but only about $6,000.00 was uncollected.

Around this time, Simon also took customer payments directly and then deposited those amounts at Cross Keys Bank, where Abby Lines had another account, rather than sending them to the lock box at the Bank.

As a result of the testimony of Thaxton and the evidence presented by the Government, the Court finds that the statements contained in the PSR are accurate and that the Government

6

has presented undisputed evidence that the Bank suffered an actual loss in this matter.

Once the Government has met its burden, Simon must produce rebuttal evidence. Although Simon attempted to rebut the Government's evidence through the testimony of her expert, Valdez never disputed the accuracy of Thaxton's findings on actual loss. Rather, Valdez's testimony was centered on the admitted negligence of the Bank's employees. While the Court recognizes that the actions of Doughty and Fortenberry were not authorized by the Bank and were, in fact, bad banking practice, the money all went to Abby Lines, not to the Bank. The negligence of the Bank and its employees is a consideration in crafting an appropriate sentence under 18 U.S.C. § 3553(a), but it does not rebut the actual loss proven by the Government. *See United States v. Weir*, 47 Fed. Appx. 113, 2002 WL 31098421, at *116-17 (3rd Cir. Sept. 19, 2002) (citation and internal quotation marks omitted) (The issue is "the amount of the victim's actual loss, not the quality of the victim's efforts to mitigate the loss.").

Accordingly, Simon's Objection to the PSR is GRANTED IN PART and DENIED IN PART. The Court has excluded from actual loss $150,000.00 paid by the Bank to Chubb Insurance for defense of civil lawsuits involving the Simons. To this extent, Simon's Objection is GRANTED, and the Bank's actual loss is reduced to $1,714,291.00. As Simon failed to rebut the Government's evidence of loss, her objection to the PSR is otherwise DENIED.

**B.     Motions for Probated Sentence and Downward Departure**

Simon moves for a downward departure on the basis that her criminal conduct was aberrant behavior from an otherwise law-abiding life. She moves the Court to give her a sentence of probation because her criminal conduct did not cause serious harm and she acted

7

under strong provocation.

Under U.S.S.G. §5K2.20, a sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior. "Aberrant behavior" is defined as a single criminal occurrence or single criminal transaction that was committed without significant planning, was of limited duration, and represents a marked deviation by the defendant from an otherwise law-abiding life. In determining whether to depart on the basis of aberrant behavior, the Court may consider the defendant's mental and emotional conditions; employment record; record of prior good works; motivation for committing the offense; and efforts to mitigate the effects of the offense.

The Court finds that the nature of Simon's offense does not involve a single criminal occurrence or transaction, but rather a series of ongoing conduct. Therefore, § 5K2.20 is not applicable.

However, the Court has considered Simon's motions under 18 U.S.C. § 3553(a) to determine a sentence that reasonably addresses Simon's real conduct and achieves the statutory goals. Specifically, the Court has considered the nature and circumstances of the offense and the history and characteristics of Simon, while also considering an appropriate sentence that would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

Based on the evidence presented, the Court finds that a sentence below the recommended Guideline range of 37 to 46 months imprisonment reasonably addresses Simon's real conduct, in light of the history of the offense, the gross mismanagement of the factoring account by the Bank, Simon's lack of criminal history, and her acceptance of responsibility, but will also adequately

reflect the seriousness of the offense.

Prior to this incident, Simon had no criminal history. She pled guilty to all three counts against her and was prepared to testify against Doughty in the criminal action pending against him. Although the charges against Doughty were later dismissed, the Court finds that a sentence of a fewer number of months recognizes the full extent of Simon's acceptance of responsibility.

Additionally, the Court finds that the actual loss suffered by the Bank exaggerates Simon's culpability. Simon acted criminally and must face the consequences of her actions, but the recommended Guideline sentence would not take into account the Bank's role in greatly increasing its loss. *See United States v. Rostoff*, 53 F.3d 398, 407-09 (1st Cir. 1995) (citation omitted) ("Precisely because the guidelines use amount of loss as a proxy for culpability in fraud cases, a supportable finding that the loss exaggerates the reality of events often is tantamount to a finding that the conventional sentencing range exaggerates a defendant's blameworthiness, and, thus, tends to invite a correspondingly downward departure.").

Therefore, Defendant's Motion for Downward Departure is GRANTED. The Court finds that a sentence of 24 months imprisonment is an appropriate sentence for Simon under the § 3553(a) factors.

For the foregoing reasons, Defendant's Motion for a Probated Sentence is DENIED.

MONROE, LOUISIANA, this 16th day of April, 2009.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE